## Bradford Gasoline Company *v*. Hanley Company, Appellant.

442

Argued May 22, 1934. Before FRAZER, C. J., SIMP-SON, KEPHART, SCHAFFER, MAXEY and LINN, JJ.

*Robert von Moschzisker,* with him *F. D. Gallup, E. G. Potter,* of *Gallup & Potter* and *Knox Henderson,* for appellant.

*T. B. Wilson,* of *Wilson & Fitzgibbon,* for appellee.

OPINION BY MR. JUSTICE MAXEY, June 30, 1934:

The basic question here is as to the issue tried. Appellant-defendant contends that the issue was plaintiff's failure to supply gas in the *quantities* paid for; appellee-plaintiff contends the issue was plaintiff's alleged failure to supply gas in proper *quality.* The court below took the latter view and directed a verdict for the plaintiff on the theory that even if there was a breach of warranty as to quality, the buyer had failed, after acceptance of the goods, to give notice to the seller within a reasonable time after the buyer knew or ought to have known of such breach and the seller was, therefore, under section 49 of the Sales Act of May 19, 1915, P. L. 543, "not liable" for the breach.

The suit was on an oral contract wherein plaintiff agreed to sell the defendant "residue gas from a gasoline plant at the rate of forty cents per thousand cubic

feet," and the defendant agreed to purchase the same. During the years 1927 and 1928, and the months of January and February, 1929, plaintiff supplied defendant with gas, which was paid for. The gas furnished during the four months following, namely, March, April, May and June, 1929, amounting to 10,703 "cubic feet" was not paid for. The claim was for $4,281.20, with interest. The affidavit of defense set forth that plaintiff's promise was to furnish gas which "would contain not less than 1350 British Thermal Units per cubic foot," and "by this representation the defendant was induced to make a contract for same" and did contract for gas thus rich in B. T. U. content. Defendant avers further that plaintiff delivered defendant only "a gaseous substance containing gas and air, at least 39½% was air" and that defendant "through the mistake of fact that the character of said gas complied with the representations and warranties of the plaintiff did pay to plaintiff at the rate of forty cents per thousand cubic feet for said gas and air." On account of this payment through the alleged "mistake of fact," defendant filed its set-off and counterclaim for $11,356.56, with interest from March 10, 1929.

Defendant appealed from the refusal of the court below to disturb the directed verdict. In its opinion the court said: "There is no dispute that the quantity delivered to the defendant was the same as claimed by the plaintiff in cubic feet, but the defendant contends that the contract was that the plaintiff was to furnish gas containing a certain number of B. T. U.'s, i. e., heat units, and that they failed to do so...... Defendant received the gas, used it in their plant and made no complaint as to its quality...... At no time from the inception of the contract until the destruction of the [plaintiff's gasoline] plant by fire was any complaint made by the defendant as to the quality of the gas and at no time was any notice given to plaintiff until it first appeared in the affidavit of defense filed

in this case. It is admitted in the pleadings that the quantity furnished is correct as claimed by the plaintiff and the only dispute is as to the quality."

Appellant's conception of the issue before us is set forth in No. 3 of its "Statement of Questions Involved," as follows: "Should defendant's position be treated in law as one only involving a deficiency in quality, and therefore, subject to the strict rules, as to ascertaining the deficiency and giving prompt notice, which governs suits on warranties, or should defendant's position be treated as really involving an allegation of lack in quantity, and subject to the rules of law applicable to the latter class of cases?"

Appellant contends that the fact in issue at the trial of this case was not the quality of the gas received by it, but its quantity, and that because of "the presence of thirty-nine and a half per cent of air in the substance supplied by plaintiff to defendant, the thing contracted for had not been delivered," or, in other words, every time the gas meter registered "1000 cubic feet," defendant received because of the presence of air in the substance so measured only 605 cubic feet of *gas*.

This brings us to the question: What were the issues framed by the pleadings? It is fundamental that "the case must be proved as laid," as Chief Justice GIBSON said in Jordan v. Cooper, 3 S. & R. 564, 580. The decision in every case must be on the issues raised by the pleadings. In the pleadings before us there is nothing equivocal as to the issue. Defendant pleads "the substance so delivered was not of the *quality* [italics supplied] agreed by the plaintiff to be furnished." Nowhere in the affidavit of defense and counterclaim is there any allegation of insufficiency of *quantity* of the gas delivered. The party which based its defense and counterclaim on lack of quality must stand on the ground it selected to do battle. Appellant seemingly recognizes the fact that relief from the judgment can be obtained only by escape from the pleadings, for it says in its

brief: "While the word 'warranty' appears in some of defendant's pleadings and defendant alleged that the gas furnished to it by plaintiff was lacking in heat units and thus deficient in quality, yet defendant's position assumed at the trial was briefly this: the substance furnished to defendant by plaintiff 'was not all gas' but 'partly air'; or, in other words, that it, defendant, had, to an extent stated, not been furnished with gas, and ought not to be obliged to pay for something which it never received. During the course of the trial, the presiding judge understood this to be the real point of the contest (as shown at 50a, 121a and 135a), but when, six months later, he came to write his final opinion he mistakenly treated the case as though strictly one of warranty of quality, 253a."

In answer to this it is sufficient to say (1) that what "the presiding judge understood" would not constitute an amendment of the pleadings. (2) The substance of all the cited remarks of the trial judge is found on 135a, where he said: "Your defense is it was not all gas, partly air and gas—is that it?" Counsel for the defendant replied: "Exactly." That reveals no idea inconsistent with the theory that the issue in the case was the quality of the gas furnished. If the gas was diluted with air, there would be a defect in quality, i. e., a deficiency in heat units, and not a deficiency in supply. It is clear from the pleadings and from the testimony that the defendant treated the substance received as gas and consumed it as gas, and its only complaint— and that a much belated one—was as to its quality. (3) The testimony shows that the issue *tried* was the quality of the gas received, not its quantity. For example, defendant's superintendent testified about asking "for an interpretation of the quality of gas we were receiving," etc. He also testified: "We believed their statement with regard to the quality was true." Throughout his testimony he spoke of the "quality" of the gas he as-

sumed his company was going to get and what quality it actually got. He testified on cross-examination: "We knew very definitely the gas was an inferior quality early in June [1929]." He was asked on cross-examination: "You got on March 11, 1929, a report that the quality of gas was not right? A. ......The report that the gas was not good. Q. You went on using it during March in spite of this report? A. Yes, sir. Q. Did you write them a letter when you got that report saying we call your attention to the fact the quality of the gas was not up to their contract? A. No, sir." He admitted that they "went right on using it during March, April, May and June, 1929, until the plant burned down" in June. He was asked again on cross-examination: "From the time you got this report, at none of these times did you write them a letter calling their attention to the quality of the gas, that it was not up to the standard, not up to the contract? A. No." Counsel for the defendant at the trial of the case repeatedly refers to the quality of the gas furnished by the plaintiff. For example, in an offer made by defendant's counsel near the close of defendant's case, he uses the following language: "......In March, 1928,...... defendant requested plaintiff to put in writing in the form of a letter plaintiff's understanding of the contract between the parties with reference to the quality of gas, the manner and quality being furnished; that under date of March 10, 1928, and in response to that request plaintiff wrote such a letter in which plaintiff informed defendant that the quality of the gas they were furnishing was very good specific gravity of .933 and that it contained 1382 B. T. U. to the cu. ft."

Appellant in its brief says: "Even at that time [prior to the trial] the parties to this controversy had in mind —though perhaps in a more or less confused way—the fact that quantity, rather than quality, was the real point at issue. As was said by the Supreme Court in

Pasquinelli v. Southern Macaroni Co., 272 Pa. 468, 481, [116 A. 372], citing authorities, 'in these practical days, issues which have never been properly pleaded are often, by mutual consent, tacitly allowed as controlling in the trial of cases,' the pleadings, if necessary, being subsequently treated as amended." The above quotation is only part of a complete sentence, and in the opinion cited it is preceded by the following: "In short, till something is shown to the contrary, the pleadings are assumed to fix the issues; but, in these practical days," etc. The pleadings here did fix the issue, and that issue was the quality of the gas furnished, and there *was* no other issue which "by mutual consent" was "tacitly allowed as controlling in the trial of the case."

While the pleadings "fixed the issues," and that is sufficient for present purposes, it may be added that defendant in using the word "quality" instead of "quantity" to designate the gravamen of its complaint against plaintiff's gas showed verbal aptness. For example, if one purchases some coal which contains an intolerable mixture of slate he would properly complain not of the deficiency in quantity but of the deficiency in the quality of the coal delivered. Likewise, if one's morning quart of milk was 39% water, he would be most likely to complain not of the milk's quantity but of its quality.

Neither is there merit in the contention that defendant contracted for "natural gas" and received only "residue gas." If the gas it received and used was not the gas it agreed to purchase and use, it should have made timely objection. To characterize the gas it accepted and used as "residue gas" is merely to impeach its quality, and what we have already said on the question of quality is sufficient to support the overruling of the numerous assignments of error predicated on "residue gas."

Defendant also contends that plaintiff had notice of faults in its supply of gas to defendant. Appellant refers to the tests made for defendant in March, 1929,

and the subsequent alleged notice that the gas "contained about 39% air" and was lacking in B. T. U. content. The maximum of defendant's proof on this point is that defendant's superintendent told "plaintiff's man" that a test had been taken of the gas and "it had not come up to our expectations." This cannot serve as a "notice to the seller of the breach of any promise or warranty." On cross-examination defendant's superintendent when asked: "Have you got in your possession a copy of the letter in which you said to these people the quality of your gas is not up to the contract?" replied: "No, we wrote none."

Binding instructions were proper in this case because defendant in its affidavit of defense admits receiving the amount of "gas" sued for, at the price stipulated, though it claims this "gas" was an adulterate admixture. This latter claim amounts, as we have pointed out, to an allegation of breach of warranty. Defendant further admits that the gas was not only received but also consumed. It is further testified by defendant's superintendent—and there is no testimony to the contrary—that no notice was given the plaintiff of the alleged defective quality of the gas except as above indicated. In this state of the record, the court below was justified in holding as a matter of law that the buyer had failed to comply with the requirements of section 49 of the Sales Act of 1915, and in directing a verdict accordingly. See Bodek & Son v. Avrach, 297 Pa. 225, 146 A. 546; and Kull v. General Motors Co., 311 Pa. 580, 166 A. 562.

The judgment is affirmed.