Jody E. **FRANKS**

v.

**NATIONAL DAIRY PRODUCTS CORPORATION.**

**Civ. A. No. 1590.**

United States District Court
W. D. Texas,
Austin Division.

March 27, 1968.

---

See also D.C., 41 F.R.D. 234.

Don L. Davis, Byrd, Davis, Eisenberg & Clark, Austin, Tex., for plaintiff.

William L. Garwood, Graves, Dougherty, Gee, Hearon, Moody & Garwood, Austin, Tex., for defendant.

## OPINION

ROBERTS, District Judge.

For a number of years past, the primary task which faced federal courts sitting in Texas in diversity cases involving products liability was that of divining the progress and direction of the Texas law in the area.[1] Through the landmark Texas cases of McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787 (Tex.1967), and Jack Roach-Bissonnet, Inc. v. Puskar, 417 S.W.2d 262 (Tex. 1967), we have witnessed the far-reaching extension of the policies of Jacob E. Decker & Sons, Inc. v. Capps, 139 Tex. 609, 164 S.W.2d 828, 142 A.L.R. 1479 (1942), to the present law as expressed in the Restatement of Torts, sections 402A and 402B. Our role then has changed in large measure from that of predicting the future of the rules to that of applying the law to new and varying fact situations. To that end we now turn our attention.

Our case arises out of an incident which occurred at a drive-in restaurant in Temple, Texas, called Jody's Big Burger. Our plaintiff, JODY FRANKS, was the owner and operator of Jody's Big Burger on August 7, 1963. Our defendant, NATIONAL DAIRY PRODUCTS CORPORATION, is the manufacturer of Kraft's Red Label type shortening, a quality shortening which is widely distributed for commercial use. Approximately one (1) month prior to August 7, 1963, plaintiff had purchased a 110 lb. container of Kraft Red Label

---

1. See, e.g., Putman v. Erie City Manufacturing Co., 338 F.2d 911 (5th Cir. 1964); Ford Motor Co. v. Mathis, 322 F.2d 267, 3 A.L.R.3d 1002 (5th Cir. 1963); Bowerman v. Goodyear Tire & Rubber Co., 105 F.Supp. 119 (N.D.Tex.1952).

type shortening from the Wells Meat Company in Killeen, Texas. Red Label type shortening was used by the plaintiff at his drive-in restaurant to prepare foods in a deep-fry cooker.

On August 7, 1963, between 7:00 and 8:00 P.M., plaintiff decided to drain his deep-fry cooker of grease and refill it with new, unused shortening. As was his practice, he turned off the thermostat heat control on the cooker and placed an empty Red Label container under the drain of the deep-fry cooker. After the cooker had cooled for about 3–5 minutes, plaintiff opened the drain plug, letting the grease drain into the empty Red Label container. After several minutes of conversation with a customer, plaintiff noted that the grease had drained out of the cooker. Plaintiff then walked over to the container, apparently to remove it from the main kitchen area. While plaintiff was bending down to pick the container up—but before he actually lifted or moved the container—there was a loud noise and the hot grease sprayed or spewed out of the container, striking the plaintiff on his hands, arms, face and shoulders. For these injuries, plaintiff seeks to hold defendant strictly liable.

## PART I

Plaintiff's first theory of recovery is that of section 402A of the Restatement of Torts.[2] In attempting to invoke successfully the section 402A formula, plaintiff demonstrates clearly that defendant NATIONAL DAIRY PRODUCTS CORPORATION was engaged in the business of selling. Also, it is clear that plaintiff is an intended user, one whom the manufacturer should have reasonably expected to use its products. There was much dispute as to whether the Red Label type shortening in our case was "in a defective condition unreasonably dangerous to the user," and whether the product reached the user without substantial change in the condition in which it was sold. Before detailing the conclusions on those points, it is necessary to review part of the testimony in the case.

Defendant's explanation for the explosion (through the expert testimony of the official in charge of production of Red Label shortening) was that the can into which plaintiff was emptying the hot shortening contained a small amount of water or similar liquid. The water, because of a vaporization temperature relatively lower than that of the shortening, rapidly vaporized, thus expanding quickly in volume. This expansion, according to the expert, caused the hot shortening to spray out of the container onto plaintiff. In short, defendant's explanation for the explosion relied on the presence of water in the container. The expert stated that unless liquid was present in the container, there could have been no explosion.

Plaintiff on the other hand testified that it was his practice to change the shortening every four (4) days. The evening of August 7, 1963, constituted the fourth day of use of that particular batch of shortening, and thus the grease needed changing. Plaintiff further testified that the container he used that evening had been washed one-to-three days earlier, and had been set upside down on a wooden rack to dry. He observed that when he set it under the

---

2. The Restatement of Torts section 402A rule is as follows:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
   (a) the seller is engaged in the business of selling such a product, and
   (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although
   (a) the seller has exercised all possible care in the preparation and sale of his product, and
   (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

drain spout of the cooker, it was dry and empty. Although there were no other witnesses to corroborate plaintiff's testimony that the can was dry and empty, this Court specifically finds that there was no water or foreign liquid in the container at the time in question.

Where then do we stand in terms of he section 402A formula? That shortening which, when put to proper use by a proper user, will explode is an unreasonably dangerous product seems beyond cavil. The troublesome problem, as counsel realized, is the section 402A requirement of the identification of a defect. Of course, it has often been stated that in cases where an explosion is involved (such as in the exploding or breaking bottle cases), the defect is so obvious as to warrant little or no discussion. Perhaps that is so because, using the test mentioned in Ozark v. Wichita Manor, 252 F.2d 671, 675 (5th Cir. 1958), an explosion of a product which does not ordinarily explode when properly used is the type of circumstance which points an accusing finger at the manufacturer. While that reasoning alone may be sound, it may nevertheless be profitable to explicate fully this Court's thoughts on the matter.

This Court is aware of what has been termed the "cornerstone rule in products liability", that "proof of mere injury furnishes no rational basis for inferring that the product was defective for its intended use." Helene Curtis Industries, Inc. v. Pruitt, 385 F.2d 841, 853 (5th Cir. 1967), and cases cited therein at n. 10. Of course, in our case, there is proof of more than the fact of plaintiff's burns—that is, we have here direct eyewitness testimony of the explosion of the product. However, there was no

testimony which identified specifically either some molecular content or some molecular arrangement of the shortening as the defect which caused the explosion.[3]

■ We are thus faced with what has already become an increasingly recurring problem in products liability cases—the necessity of proof of defective condition by the use of circumstantial inferences. This method of proof has long been permitted in negligence cases, under the doctrine of res ipsa loquitur, to allow the jury to infer negligence from an unexplained accident, provided certain factors were present. The Fifth Circuit recently reiterated the rule within the strict liability framework:

> (W)hen circumstantial evidence is the only proof, courts have infrequently inferred negligence (here a defect) simply from the accident and proof of careful conduct by the plaintiff, and then only in instances where the accident is the type which, standing alone, points an accusing finger at the maker.

Helene Curtis Indus., Inc. v. Pruitt, 385 F.2d 854. It is essential to the proving of a defect in that manner (where, as is nearly always the case, the product is in the hands of a user or consumer) that the plaintiff negative improper handling or use[4] and that plaintiff negative causes of the accident other than the product's own defective condition.[5]

First, the question of plaintiff's use of the product. Although the defendant's instructions for the use of Red Label type shortening are contained in the Kraft's Practical Buying Guide and in the Handbook for Kraft Salesmen, the testimony indicated that there were two critical areas as to proper use. It

---

3. A sample of what was thought to be part of the exploded shortening was sent to a research chemist for testing and examination, but he did not run the melting test to ascertain if the sample would suddenly explode or burst into flame. His explanation for not running the test was as follows:

Because Sample 2, the dark sample, had previously exploded, I was advised by a

superior not to attempt to melt the sample because of possible injury to myself or anyone else in the laboratory.

4. Evangelio v. Metropolitan Bottling Co., 339 Mass. 177, 158 N.E.2d 342, 347 (1959).

5. Jakubowski v. Minnesota Mining & Mfg., 42 N.J. 177, 199 A.2d 826, 830 (1964).

was recommended that the Red Label user daily filter the shortening being used by draining it through a filter or strainer (thus removing food and breading particles), then clean the deep-fry cooker, and then replace the used shortening in the cooker. This Court finds that plaintiff complied with this recommendation. It was further the plaintiff's practice to drain the shortening and throw it away every four (4) days. Again this more than satisfies the manufacturer's use requirements.

Section 402A limits recovery to cases in which the product reaches the consumer or user without substantial change in the condition in which it is sold. It is well-known that shortening when used turns brown (from an original white) and through use will acquire very small amounts of the cooked items. Inasmuch as this cooking is the use intended, it appears to this Court that those changes are not substantial within the meaning of the rule. In any event, as stated in comment "p" to section 402A, the question is essentially whether the responsibility for discovery and prevention of the dangerous defect should remain with the manufacturer or shift to a later party in the chain. The answer in our case is clearly that the manufacturer retains that responsibility. The requirement that there be no substantial change in the condition of the product should be no obstacle to plaintiff's recovery here.

■ Under the *Jakubowski* reasoning, it is further necessary for the plaintiff to negative causes of the explosion other than the product's defective condition. It appeared from the testimony that there could have been three possible causes for the explosion. Defendant's primary reliance was on the explanation that there was either water or other similar liquid in the bottom of the container when plaintiff started the draining process. This Court found above that there was no such water or liquid present. Conceivable there could have been some type of foreign solid in the shortening; however, plaintiff's proper use (both in terms of filtering and in terms of the short periods of use) of the shortening indicates that this was not the case. This Court concludes that the only explanation for the explosion which injured plaintiff is that there was some defective condition in the product itself. This is the only inference which is reasonable under the circumstances.

National Dairy's defense as to other causes of the explosion is similar to the defenses urged in Marathon Battery Co. v. Kilpatrick, 418 P.2d 900, 914 (Okl. 1966), and Otis Elevator Co. v. Robinson, 287 F.2d 62, 64 (5th Cir. 1961). What we have is a manufacturer's expert who expresses the opinion that an object will not explode in the absence of a foreign substance such as water. Once it is determined by the fact-finder that there was no foreign substance, the manufacturer's defense is revealed to be simply that there was no explosion. As to this fact, there can be no quarrel: in our case there was an explosion.

The only other legal question raised was National Dairy's defense of misuse. While we assume that misuse is a valid defense under section 402A in Texas, in light of what was said earlier as to plaintiff's careful conduct in following the instructions, defendant has not sustained the misuse defense.

### PART II

■ Plaintiff's alternative claim is based on a section 402B misrepresentation cause of action.[6] As found in Part I, defendant is a seller within the mean-

---

6. The Restatement of Torts section 402B rule is as follows: One engaged in the business of selling chattels who, by advertising, labels, or otherwise, makes to the public a misrepresentation of a material fact concerning the character or quality of a chattel sold by him is subject to liability for physical harm to a consumer of the chattel caused by justifiable reliance upon the misrepresentation, even though (a) it is not made fraudulently or negligently, and (b) the consumer has not bought the chattel from or entered into any contractual relation with the seller.

ing of the rule. The hurdles to plaintiff's use of section 402B are the identification of the misrepresentation as to quality and the correlation of any reliance with the misrepresentation.

The evidence as to express representations consists of the brochure directed to prospective users of Red Label and the handbook for the salesmen. While both suggest the manner in which Red Label shortening should be used, neither expressly represents that the product can be used safely. Of course, it could be contended that a term implied in the language is that the shortening could be used safely; in other words, if a manufacturer expressly states that a product can be used for certain periods of time in a certain manner, then a user is justified in interpreting that express language to mean that it can be used safely and without explosion for that period in that manner. But there is a fatal defect in any representation theory which is grounded on construction of the express language in the written materials—the plaintiff testified clearly and unequivocally that he did not rely upon the brochures or any other writing.

Plaintiff seems to advance another suggestion as to the manner in which this Court might find reliance on a representation as to quality. The reasoning is suggested by the following dictum by Chief Justice Traynor in Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 701, 377 P.2d 897, 901, 13 A.L.R.3d 1049 (1962):

In the present case, for example, plaintiff was able to plead and prove an express warranty only because he read and relied on the representations of the Shopsmith's ruggedness contained in the manufacturer's brochure. Implicit in the machine's presence on the market, however, was a representation that it would safely do the jobs for which it was built. Under these circumstances, it should not be controlling whether the plaintiff selected the machine because of the statements in the brochure, or because of the machine's own appearance of excellence that belied the defect lurking beneath the surface, or because he merely assumed that it would safely do the job it was built to do.

Plaintiff thus argues that whenever a product is placed on the market, there should be implied a section 402B representation that the product would perform safely within the scope of its intended use. In support of this theory, plaintiff testified that he in fact relied on Kraft's name, that he had used Kraft products for over seven (7) years and that Red Label shortening had served him well in this past use.

This Court is unable to read the section 402B language as to representations is such a liberal manner. The language in the Restatement of Torts, particularly in comment "h" to section 402B, directs our attention to what we normally denominate as express representations, either oral or written. While the illustrations in the section were certainly not intended to be exhaustive, nevertheless, they speak only in terms of express representations. And in spite of the impressive expression of policy in Greenman v. Yuba Power Products, Inc., supra, we can find no court which has sustained recovery on that doctrine alone.

Perhaps the basis for our reticence lies in our view of the proper section 402A vis-a-vis section 402B strict liability structure. As suggested in comment "b" to section 402B, the additional feature required under that section (but not under section 402A) is the affirmative misrepresentation as to quality or character. If one adopts the plaintiff's contention that implicit in the presence of a product in the marketplace is the implied guarantee that it will safely do the jobs for which it was intended, then the section 402A requirement that a product not only be dangerous (i. e. unsafe) but unreasonably so has been redefined in terms solely of a representation of safe use; and the section 402A requirement of proof (by direct or circumstantial evidence) of "defective condition" has been effectively extinguished. At that point, we may well have reached

the age in which, at least as to safe use to prevent physical harm to consumers, we have made manufacturers absolute insurers. This Court does not feel warranted in making such an assumption as to the Texas view of products liability.

### PART III

■ Our remaining task is that of assessing damages due the plaintiff. Our plaintiff will forever, in all likelihood, bear the burn scars on his face, arms, chest, and shoulders. The treatment of the burns involved a considerable sum of money, and plaintiff's recovery was accompanied by physical pain and suffering and emotional distress. Plaintiff's eyesight is partially affected by bright sunlight as a result of the injuries. We heard testimony as to plaintiff's business losses occasioned by the explosion, and there was testimony as to the cost of domestic help while plaintiff was recuperating. Under all the circumstances, we find that National Dairy Products Corporation is liable to the plaintiff as discussed in Part I. It is ordered that the defendant pay to the plaintiff the sum of $15,874.10 and court costs which this Court finds to be the value or sum which will fairly and reasonably compensate plaintiff for his injuries. It is so ordered.